**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
HEATHER SIMMONS,

         Plaintiff,      **COMPLAINT**

    -against-

                 **PLAINTIFF DEMANDS**
                 **A TRIAL BY JURY**
STONY BROOK SOUTHAMPTON HOSPITAL,

and SOUTHAMPTON PEO,

         Defendants.
-----------------------------------------------------------X

  Plaintiff ("Plaintiff"), Heather Simmons, by and through her attorneys PHILLIPS & ASSOCIATES ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff brings this action alleging that the Defendant has violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, as amended, ("ADA") and the New York State Human Rights Law, New York State Executive Law §§ 290 *et seq.* ("NYSHRL"), and seeks damages to redress the injuries she has suffered as a result of being discriminated and retaliated against by her employer on the basis of her disability (Antiphospholipid Antibody Syndrome – an autoimmune and blood-clotting disorder) and for requesting a reasonable accommodation (to be exempt from receiving the Covid19 vaccine). Defendants failed to engage in an interactive process with Plaintiff after receiving her request for an accommodation, and instead, summarily suspended and then terminated her because of her disability and in retaliation for her reasonable

1

accommodation request, in violation of the law. Defendants further retaliated against Plaintiff by "vigorously" challenging her application of unemployment benefits after her unlawful termination.

## JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. §§ 12101 *et seq.*, and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PROCEDURAL PREREQUISITES

5. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 10, 2021.

6. Plaintiff received a Notice of Right to Sue from the EEOC on June 02, 2022. A copy of the Notice is annexed hereto as Exhibit A.

7. This action is being commenced within 90 days of the issuance of the Notice of Right to Sue.

## PARTIES

8. Plaintiff Heather Simmons ("Ms. Simmons") is a 32-year-old female. She lives in Center Moriches, New York, Suffolk County.

9. Ms. Simmons has been diagnosed with Antiphospholipid Antibody Syndrome which is a serious blood-clotting and autoimmune disorder.

10. Antiphospholipid Antibody Syndrome is a medical impairment that imposes a substantial

        impact on several major bodily functions of Ms. Simmons, including the functioning of her circulatory system and her reproductive system.

11. Defendant Stony Brook Southampton Hospital is a 125-bed accredited hospital located in Southampton, New York, Suffolk County.

12. Defendant Southampton PEO, a professional employer organization, is located within the State of New York. Southampton PEO oversees and has some oversight regarding the employees working at Stony Brook Southampton Hospital.

13. Defendant Stony Brook Southampton Hospital and Defendant Southampton PEO (collectively referred to herein as the "Defendants" or the "Hospital,") were joint employers of Plaintiff for the purposes of this litigation.

14. Plaintiff was employed by Defendants and capably performing the essential functions of her job at all relevant times.

15. Defendants each employ more than 15 employees.

16. Defendants each determined policies, procedures, and conditions of employment which directly affected Plaintiff's working conditions and determinations that led to her termination.

17. Plaintiff worked at Defendant Stony Brook Southampton Hospital facility at all relevant times, and the Hospital directed her day-to-day work, dictated how she carried out her work, and received, assessed, and denied her accommodation request.

18. Defendant Southampton PEO paid Plaintiff's wages and issued her letter of termination.

**MATERIAL FACTS**

19. Ms. Simmons was hired by Defendants on April 1, 2019, as a Registered Nurse ("RN").

20. Prior to becoming an RN, Ms. Simmons worked for Defendants for several years in other

3

capacities, such as nursing assistant and receptionist in the Emergency Room.

21. In 2019, Ms. Simmons earned an Associate of Science Degree in Nursing at Suffolk County Community College.

22. Ms. Simmons went back to school part-time to further her nursing knowledge, achieving a Bachelor of Science Degree at Stony Brook University in 2021.

23. Ms. Simmons was one of our "health-care heroes" of the Covid-19 pandemic, putting her well-being on the line while working at the Hospital throughout a time of great uncertainty and fear.

24. On or about September 17, 2021, Ms. Simmons received an annual performance evaluation that recognized her high-quality work. Her charge nurse wrote:

   1. *Heather is a true professional. She is informative and educates her patients.*

   2. *Heather is an empathetic, caring nurse. She advocates on behalf of the patient/family. She is always ready to help her co-workers. She delivers excellent care to the patients.*

25. The Hospitals Covid-19 workplace safety protocols and policies changed throughout the pandemic.

26. On or about September 10, 2021, the Hospital adopted a policy of mandatory vaccination for all employees. The policy stated that those not vaccinated will be first suspended without pay, and then terminated 30 days thereafter, if still not vaccinated.

27. Ms. Simmons is not able to get the Covid-19 vaccine at this time, given the high probability that she may suffer severe permanent health consequences, including the risk to her life.

28. There is currently limited knowledge regarding Ms. Simmons' medical condition and limited data and knowledge regarding the potential harm that could arise from the vaccine

for someone with Ms. Simmons medical status.

29. Ms. Simmons' concerns are legitimately based upon her medical history and disease diagnoses, which rise to the level of a disability, as well as her treating hematologist's opinion.

30. The Hospital's mandatory vaccine policy "allows for *limited* (emphasis in original text) medical exemptions with reasonable accommodations, consistent with applicable law."

31. On September 21, 2021, facing an excruciating choice between gainful employment and the risk of life-altering physical harm, Ms. Simmons submitted a request for a reasonable accommodation, exempting her from the vaccine.

32. Ms. Simmons followed the Hospital's procedures for an accommodation request, used the required forms, and attached a letter from her hematologist at the New York Cancer and Blood Specialists.

33. Her doctor's supporting letter states in relevant parts:

   1. *THERE IS THEORETICAL EVIDENCE OF POTENTIAL INCREASED RISK OF THROMBOSIS IN PATIENTS WITH ANTIPHOSPHOLIPID SYNDROME THEREFORE AT THIS TIME IT IS OUR RECOMMENDATION THAT THE PATIENT HOLD OFF ON RECEIVING THE COVID 19 VACCINE AS IT MAY INCREASE HER RISK OF THROMBOSIS UNTIL THERE IS MORE DATA.*

      *HER QUANTATIVE COVID ANTIBODIES WERE CHECKED, WHICH IS ELEVATED, GIVING EVIDENCE THAT SHE MAY HAVE SOME PROTECTION AT THIS TIME, ALONG WITH MANDATED MASK WEARING.*

34. Immediately prior to writing the exemption letter, Ms. Simmons' hematologist did blood work that showed a medically significant elevation of IGM Immunoglobulins and IGM Anticardiolipin, which along with her health history, confirmed her diagnosis of Antiphospholipid Antibody Syndrome.

35. The same blood work also confirmed Ms. Simmons had significant levels of Antibodies for Covid-19.

36. This followed from the fact that Ms. Simmons contracted Covid-19, presumably at work, in December of 2020.

37. According to research, such Covid-19 antibodies from prior infection provide protection against getting or transmitting Covid-19.

38. On September 27, 2021, having not received a response of any kind regarding her accommodation request, the Hospital suspended Ms. Simmons without pay, compensation or accrual of benefits, because she was unvaccinated.

39. On the same day of the suspension, Ms. Simmons received a terse letter from the Hospital, dated September 24, 2021, denying her reasonable accommodation request stating: "Based on the information provided, you have not met the criteria to be exempt from the Covid-19 vaccine."

40. Thereafter, Ms. Simmons attempted to get more information and engage in an interactive process and/or appeal the decision, but she got nowhere.

41. On October 28, 2021, the Hospital informed Ms. Simmons that she was terminated for cause.

42. Ms. Simmons believes that there are multiple accommodations that would allow her to continue to work unvaccinated and while still keeping patients safe. Yet, she was not given the opportunity to discuss any such options with the Hospital.

43. As supported by the additional facts set out below, Ms. Simmons was discriminated against and discharged because of her disability.

## The Hospital's Retaliatory Policy and Conduct

44. Along with its mandatory vaccine mandate, the Hospital instituted a blanket, retaliatory policy that it would "vigorously challenge" any terminated employee's filing for

unemployment benefits.

45. Ms. Simmons engaged in the protected activity of filing for unemployment benefits after her discriminatory termination.

46. The Hospital's policy and act of "vigorously" challenging her application for benefits after her discriminatory discharge is an act of retaliation.

## Medical History and Diagnosis

47. Ms. Simmons has suffered a rare life-threatening incident and has been diagnosed with rare conditions related to blood-clotting and immunological disorders. As such, the medical knowledge about her disability is limited.

48. In 2006, when Ms. Simmons was a teenager, she became ill with a sore throat. At first it was assumed to be a virus, but then discovered to be bacterial.

49. As she failed to recover, and instead took a drastic turn for the worse, her dad took her to Peconic Bay Hospital, but she was soon transferred to Stony Book Hospital for a higher level of care as her condition continued to decline.

50. Ms. Simmons suffered a combination of life-threatening conditions, including acute respiratory distress, acute renal (kidney) failure, Septic shock, and Thrombocytopenia, which is characterized by low platelets and abnormal bleeding and blood clotting.

51. The doctors finally diagnosed the cause of Ms. Simmons severe medical crisis: Lemierre's syndrome, leading to a blood clot in her internal jugular vein.

52. Lemierre's syndrome is a rare and potentially life-threatening complication of bacterial infections, often of the throat, that usually affects previously healthy adolescents and young adults. In people with Lemierre's syndrome, the initial infection spreads into tissues and deep spaces within the neck, leading to the formation of an infected blot

7

clot (septic thrombophlebitis).

53. With the hopes of saving Ms. Simmons life, the doctors placed her in a medically induced coma for four days in the Pediatric Intensive Care Unit. She remained in the intensive care unit for 15 days post-coma.

54. After being in the hospital for three weeks, she was finally released with a peripherally inserted catheter for a 4-week home-treatment cocktail of antibiotics, nutrients, and a blood thinning medication.

55. Ms. Simmons took medication for a full year after this medical crisis. She recovered, but the systemic effects of Lemierre are not clear and the syndrome can be ongoing. For example, when ill, Ms. Simmons becomes sicker than most.

56. In 2017, with ongoing concerns about her history of the blood-clotting syndrome and additional gynecologically-related blood clotting issues, Ms. Simmons sought treatment with New York Cancer and Blood Specialists at the Southampton office.

57. Her hematologist ordered a full laboratory panel of bloodwork. The results indicated that she had elevated antiphospholipid and IGM antibodies.

58. Ms. Simmons was diagnosed with Antiphospholipid Antibody Syndrome ("APS") which is a serious and rare autoimmune and blood-clotting disorder.

59. In APS, antibodies, which help the body defend against infection, can mistakenly attack phospholipids (proteins), which in turn, can damage cells. This damage causes blood clots to form in the body's arteries and veins. Too much blood clotting can block blood flow and damage the bodies organs. This damage can be irreversible.

60. The reason these antibodies attack these proteins, and the process by which they cause blood clots to form, is not known.

61. What is known is that APS can lead to many serious and fatal health problems such as stroke, heart attack, kidney damage, deep vein thrombosis, and pulmonary embolism. APS also causes difficulties related to completing a healthy pregnancy.

62. APS is diagnosed when a person has both, elevated antiphospholipid and IGM antibodies, and a history of blood-clotting disorders, as is the case for Ms. Simmons.

63. APS has no cure.  As informed by her hematologist, Ms. Simmons will remain at a high risk of blood clots, which can be life-threatening, along with a high chance of pregnancy complications and recurrent miscarriages if she were to become pregnant.

64. Ms. Simmons' current treatment for APS requires vigilance over anything that implicates blood flow (injury, surgery, pregnancy, etc.) and the monitoring of clotting factors in her blood.

## Shifting COVID-19 Protocols at Southampton Hospital

65. The Hospital and its staff have been impacted by the Covid-19 pandemic, from approximately March 2020 until the present, as all medical providers have been.

66. The Hospital instituted various safety protocols to protect patients and employees, including the use of Personal Protective Equipment (PPE) and testing requirements.

67. These protocols changed over time, generally becoming less restrictive.

68. In or around late December 2020 to early January 2021, the brand new Covid-19 vaccine started to become available pursuant to the FDA's emergency authorization powers and the Hospital encouraged its employees to get vaccinated.

69. At no point during the pandemic, regardless of vaccine status, did the Hospital require its employees to undergo regular covid testing.  Ms. Simmons recalls it being discussed, but not implemented.

70. Testing and self-quarantining was required *only* for an employee who exhibited symptoms.

71. Regardless of vaccination status, the Hospital required PPE of N-95 face masks, face shield, googles, gown, booties, gloves, and head caps *only* for medical providers working directly with patients diagnosed with Covid-19.

72. For most other medical providers, such as Ms. Simmons, the PPE required was a standard surgical face mask, face shield, and googles.

73. Up until Ms. Simmons last day at work, the Hospital placed patients in rooms together regardless of vaccine status.

74. Patients may roam freely in hallways and other areas of the hospital wearing only a surgical mask, regardless of vaccine status.

75. On August 26, 2021, the New York State Department of Health issued a regulation requiring most health providers to be vaccinated against COVID-19 within 30 days, allowing for a possible exemption based upon disability or medical issues.

76. On or around September 10, 2021, the Hospital instituted a vaccine mandate for all employees based upon the directive from the New York State Department of Health.

### **Available Accommodations That Do Not Cause an Undue Burden**

77. The New York State Department of Health vaccine mandate allowed for disability exemptions as is required pursuant to federal and state disability law.

78. The Hospital could have accommodated Ms. Simmons disability-related unvaccinated status in ways that would not cause an undue burden or increase the risk of harm to staff or patients.

79. In the first instance, Ms. Simmons had Covid-19 previously and recent testing revealed

she still had elevated antibodies. As such, her risk of her being re-infected or transmitting the virus to others was, according to accumulating data, at least equal to the chance that a fully vaccinated employee could suffer a break-through infection and/or cause transmission.

80. Nevertheless, as an accommodation to the mandatory vaccine policy, Ms. Simmons could have been periodically tested to monitor her antibody level, acknowledging the fact that antibodies acquired post-infection can vary by person and/or decrease over time.

81. However, it is important to note that the same phenomena – variation in the strength of antibodies per person and/or declining protection over time - also occurs in those vaccinated. Despite this fact, there is no testing currently done at the Hospital to monitor the antibody levels in those vaccinated.

82. Another accommodation that could have been considered is requiring Ms. Simmons to wear more PPE than that current level required of her colleagues. For instance, wearing an N-95 in addition to the other required PPE, at all times.

83. Well-fitting and appropriately worn N-95 masks are seen as the gold-standard in providing protection against the virus. Along with other PPE, the N-95 mask is still considered top-notch protection against Covid-19 and other transmittable infections.

84. Yet, for a substantial period prior to the Hospital's vaccine mandate, Ms. Simmons and her colleagues were only required to wear surgical masks, not N-95 masks, along with other PPE.

85. Similarly, Ms. Simmons could have submitted to Covid-19 testing before shifts. This precautionary strategy was discussed, but never implemented at the Hospital, regardless of vaccine status.

86. Lastly, Ms. Simmons could have - and would have - submitted to a combination of testing, monitoring and increased PPE use to save her job.

87. These reasonable accommodations options are not unduly burdensome for the Hospital, and in combination, would have risen substantially above the prior or current safety protocol requirements.

88. Such accommodations are demonstrably reasonable as they have been successfully utilized by the Hospital, in some combination, for the duration of the pandemic and prior to the vaccine mandate.

89. Alternatively, the Hospital could have transferred Ms. Simmons temporarily to a job that minimized her exposure to patients until further information and data around consequences for those with rare blood disorders are more firmly established. Potential duties outside of patient care could entail record keeping or audits related to medical records, medications, or insurance matters.

90. Lastly, the Hospital could have granted a leave of absence to Ms. Simmons.

## **Defendants' Discriminatory Conduct**

91. In issuing its vaccine mandate, the Hospital stated that it "allows for *limited* (emphasis in original text) medical exemptions with reasonable accommodations, consistent with applicable law."

92. The Hospital's policy and practice of undertaking "limited" consideration of Ms. Simmons' reasonable accommodation disability request is per se illegal and discriminatory conduct. Disability anti-discrimination law does not empower the Hospital to issue blanket limitations, *a priori* or *posteriori,* to employee accommodation requests.

93. The Hospital discriminated against Ms. Simmons on the basis of her disability as it failed

       to meet its legal obligation to engage in a flexible, individualized, and interactive process with her to identify and meaningfully consider workplace accommodation options that did not constitute an undue hardship for the Hospital.

94. The Hospital discriminated against Ms. Simmons on the basis of her disability when it suspended her without pay and terminated her employment, instead of granting her a reasonable accommodation which would have allowed her to continue performing her job.

95. The Hospital is not entitled to legal refuge to its discriminatory conduct against Ms. Simmons by claiming it's required adherence to New York State's vaccination mandate because, *inter alia*,:  1) New York state's vaccine mandate did allow for reasonable accommodation of medical conditions; 2) The Hospital, as the employer, is the sole actor in determining whether to consider and/or grant Ms. Simmons' reasonable accommodation request instead of suspending and terminating her; and 3) a state mandate cannot trump federal law.

96. The Hospital cannot establish a "direct threat" defense to its discriminatory conduct, which requires the Hospital to undertake an individual analysis and weighing of at least four factors, because as set out below, there are reasonable accommodations that Ms. Simmons could have been granted that would have reduced the risk of harm to the same level as that of vaccinated employees and not have unduly burdened the Hospital.

### Harm to Plaintiff

97. Plaintiff has been left emotionally devastated by the loss of her livelihood, nursing, which she loves and to which she was devoted.

98. Plaintiff has suffered reputational harm by the Hospital's discriminatory conduct.

99. Plaintiff has suffered not only the loss of this job, but her opportunity to continue working

13

as an RN at any nearby hospital has been severely curtailed, if not ended entirely.

100. Plaintiff has suffered the loss of time and money of obtaining her degree and licensure to be an RN, which she may never recoup.

101. Plaintiff has suffered from being denied a modicum of financial relief through unemployment benefits

102. Plaintiff has suffered professional and personal humiliation and embarrassment.

103. Plaintiff has experienced emotional distress including anxiety, depression, severe sleep disturbance, ruminations, mood swings, and withdrawn and avoidant behavior.

104. Plaintiff has experienced physical symptoms such as such as gastrointestinal disturbances, vomiting diarrhea, weight gain, tension headaches, heart palpitations, and fatigue.

105. Plaintiff has sought treatment for her emotional distress at South Shore Counseling and Psychological Services.

106. Defendant's actions and conduct were intentional and aimed at harming Plaintiff.

107. Defendant's knowingly and willfully refused to provide Plaintiff with a reasonable accommodation for her disabilities.

108. Plaintiff suffered profound adverse employment actions, suspension without pay and termination, because of her disability and request for accommodation.

109. But for Plaintiff's disability and request for an accommodation, a protected activity, she would not have been subjected adverse employment actions at the hands of Defendant.

110. As a result of the acts and conduct complained of herein, Plaintiff has suffered the loss of income, the loss of a salary, bonus, benefits, and other compensation, which such employment entails.

111. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering,

inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

112. Plaintiff has experienced severe emotional and physical distress.

113. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

### Plaintiff's Claims are Actionable and Defendants' Conduct is Egregious

114. Defendant is an employer subject to the ADA and the NYSHRL.

115. At all relevant times, Plaintiff was an individual with a disability within the meaning of the ADA and the NYSHRL.

116. At all relevant times, Plaintiff was and is a qualified individual who can perform the essential functions of her employment with or without a reasonable accommodation as defined by § 12111(8) of the ADA.

117. At all times relevant, Plaintiff's disabilities were health impairments which substantially limit one or more major bodily functions within the meaning of § 12102(1)(A) of the ADA.

118. Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

119. As such, Plaintiff demands punitive damages against Defendant.

### AS A FIRST CAUSE OF ACTION
### DISCRIMINATION UNDER THE ADA

120. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

121. Plaintiff claims Defendant violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at Section 12101.

122. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section

12112 "Discrimination" states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

123. Defendant engaged in an unlawful discriminatory practice by failing to engage in an interactive process with Plaintiff pursuant to her accommodation request and by failing to provide Plaintiff with a reasonable accommodation.

124. Defendant engaged in an unlawful discriminatory practice by creating and implementing a policy and standard for accommodation requests, that on its face, is contrary to law.

125. Defendant engaged in unlawful discriminatory action by suspending Plaintiff for 30 days without pay, compensation or benefits because of her disability.

126. Defendant engaged in unlawful discriminatory action by terminating Plaintiff because of her disability.

## AS A SECOND CAUSE OF ACTION
## RETALIATION UNDER THE ADA

127. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

**128.** 42 U.S.C. § 2000e-3(a) states that it shall be an unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, …

129. The above section forbids retaliation for engaging in protected activity.

130. Defendant engaged in unlawful retaliatory conduct by suspending and terminating Plaintiff's employment because she made a disability-based accommodation request, a

protected activity.

131. Defendant engaged in unlawful retaliatory conduct by issuing a policy to "vigorously challenge" an employee's application for unemployment benefits, a protected activity, upon Defendants' termination due to vaccine status.

132. Defendant engaged in retaliation by interfering with Plaintiff's legal right to obtain unemployment benefits, a protected activity, upon Defendants' unlaw termination of her employment.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

133. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

134. The New York State Executive Law § 296(1)(a) provides that,

> It shall be an unlawful discriminatory practice: For an employer … because of an individual's … disability… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

135. Defendant engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by suspending Plaintiff for 30 days without pay, compensation or benefits because of her disability.

136. Defendant engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(a) by terminating Plaintiff because of her disability.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

137. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

138. The New York State Executive Law § 296(1) (e) and (h) forbid retaliation for engaging in protected activity.

139. Defendant engaged in unlawful retaliatory conduct by suspending and terminating Plaintiff's employment because she made a disability-based accommodation request, a protected activity.

140. Defendant engaged in unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(e) and (h) by maintain a retaliatory policy and interfering with Plaintiff's legal right to obtain unemployment benefits, a protected activity, upon Defendants' unlaw termination of her employment.

## JURY DEMAND

141. Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by the ADA and the NYSHRL, by discriminating against Plaintiff on the basis of her disability, and retaliating against her;

B. Awarding damages to the Plaintiff, retroactive to the date of her discharge for all lost wages and benefits resulting from Defendant's unlawful termination of her employment and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, interests, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants unlawful employment practices.

Dated: New York, New York
June 8, 2022

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**

By: _____
Michelle A. Caiola, Esq.
*Attorney for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901-2107
mcaiola@tpglaws.com