UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEATHER SIMMONS,<br><br>Plaintiff,<br><br>v.<br><br>STONY BROOK SOUTHAMPTON HOSPITAL, *et al.*,<br><br>Defendants. | **DECISION AND ORDER**<br>22-CV-3383 (WFK) (ST) |

**WILLIAM F. KUNTZ, II, United States District Judge:**

Heather Simmons ("Plaintiff") brings this action against Stony Brook Southampton Hospital, Stony Brook University Hospital (collectively, "Hospital Defendants"), and Carol Gomes ("Gomes") in her individual and official capacities (together with Hospital Defendants, "State Defendants"), as well as StaffCo of Brooklyn, LLC d/b/a Southampton PEO ("Defendant StaffCo," together with State Defendants, "Defendants") for alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, as amended (the "ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended (the "Rehab Act"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"). *See* Second Am. Compl. (the "2d Am. Compl.") ¶¶ 160–92, ECF No. 37.[1] Before the Court are State Defendants' and Defendant StaffCo's Motions to Dismiss Plaintiff's Second Amended Complaint. *See generally* State Defs.' Mot. to Dismiss, ECF No. 47; Def. StaffCo's Mot. to Dismiss ("StaffCo Mot. to Dismiss"), ECF No. 51. For the following reasons, Defendants' motions to dismiss are GRANTED.

## I. BACKGROUND

### A. Plaintiff's Claims

Defendants "were joint employers of Plaintiff for the purposes of this litigation." 2d Am. Compl. ¶ 14. Defendant Stony Brook Southampton Hospital is an accredited hospital in Southampton, New York, and one of four different campuses encompassed by Defendant Stony

[1] Citations are to the docket in *Simmons v. Stony Brook Southampton Hosp., et al.*, 22-CV-3383. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

Brook University Hospital medical center. *Id.* ¶¶ 11–13.[2] Hospital Defendants received federal funding during the relevant time period. *Id.* ¶¶ 16, 175. Defendant Gomes is Stony Brook University Hospital's Chief Executive Officer ("CEO") and Chief Operating Officer ("COO"), and "oversaw Stony Brook Southampton Hospital's response to the COVID-19 pandemic," including the hospital's staff vaccination policies and procedures. *Id.* ¶ 13. Defendant StaffCo is a "professional employer organization" which exercised "some oversight regarding the employees working at [Hospital Defendants]" and is party to a professional employer agreement with Defendant Stony Brook University Hospital. *Id.* ¶¶ 14–15. Stony Brook University Hospital's agreement with Defendant StaffCo "delegate[s] authority for certain employment decisions for hospital staff." *Id.* ¶ 15.

"On August 26, 2021, the New York State Department of Health issued a regulation [(the "State Mandate")] requiring most health providers to be vaccinated against COVID-19 within 30 days, allowing for a possible exemption based upon disability or medical issues." *Id.* ¶ 103; *see supra* Section IV(A)(v). The State Mandate exempted individuals from the vaccine requirement "[i]f any licensed physician, physician assistant or certified nurse practitioner certifie[d] that immunization with COVID-19 vaccine [was] detrimental to the health of member of a covered entity's personnel, based upon a pre-existing health condition[.]" *Id.* ¶ 104 (quoting 10 N.Y.C.R.R. § 2.61(d)).

On or around September 10, 2021, Hospital Defendants adopted a mandatory COVID-19 vaccination policy for all employees pursuant to the State Mandate. *Id.* ¶¶ 31, 105. "The policy stated that those not vaccinated will be first suspended without pay, and then terminated 30 days

---

[2] Unless otherwise stated, the following facts are taken from Plaintiff's Second Amended Complaint, which are taken as true at the motion to dismiss stage. *See Cohen v. Koenig*, 25 F.3d 1168, 1171–72 (2d Cir. 1994) (citing *Cooper v. Pate*, 378 U.S. 546, 546 (1964)).

thereafter, if still not vaccinated," *id.* ¶ 31, and provided for "*limited* . . . medical exemptions with reasonable accommodations, consistent with applicable law[,]" *id.* ¶ 38 (emphasis in original text of the policy). The hospitals further enacted a blanket policy "that [they] would 'vigorously challenge' any terminated employee's filing for unemployment benefits." *Id.* ¶ 64; *see also* Ex. 5 at 3, ECF No. 51-6 ("Please note that all claims for unemployment compensation based upon termination for cause will be vigorously challenged.").[3]

Defendants employed Plaintiff as a registered nurse from April 1, 2019, until October 28, 2021. 2d Am. Compl. ¶¶ 24, 62. Plaintiff suffers from Antiphospholipid Antibody Syndrome ("APS"), a "serious blood-clotting and autoimmune disorder" which "imposes a substantial impact on several major bodily functions of [Plaintiff], including the functioning of her circulatory system and her reproductive system." *Id.* ¶¶ 9–10. Specifically, in patients with APS, "antibodies, which help the body defend against infection, can mistakenly attack phospholipids (proteins), which, in turn, can damage cells," and "cause[] blood clots to form in the body's arteries and veins." *Id.* ¶ 82. "APS can lead to many serious and fatal health problems such as stroke, heart attack, kidney damage, deep vein thrombosis, [ ] pulmonary embolism[,]" and can "cause[] difficulties related to completing a healthy pregnancy." *Id.* ¶ 84.

APS has no cure, *id.* ¶ 86, and it is unknown why "these antibodies attack these proteins, and the process by which they cause blood clots to form[,]" *id.* ¶ 83. As such, Plaintiff "will remain at a high risk of blood clots, which can be life-threatening, along with a high chance of pregnancy complications and recurrent miscarriages if she were to become pregnant." *Id.* ¶ 86.

---

[3] At the motion to dismiss phase, a court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Santos v. Kimmel*, 154 F.4th 30, 33 (2d Cir. 2025) (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

Plaintiff's condition "requires vigilance over anything that implicates blood flow (injury, surgery, pregnancy, etc.) and the monitoring of clotting factors in her blood." *Id.* ¶ 87.

Plaintiff alleges she cannot receive the COVID-19 vaccine "given the high probability that she may suffer permanent health consequences, including the risk to her life." *Id.* ¶ 32. Plaintiff bases her concerns on her medical history and disease diagnoses, as well as her treating hematologist's opinion and purportedly well-accepted scientific research. *Id.* ¶ 37.

However, Plaintiff also notes "[t]here is currently limited knowledge regarding [her] medical condition and limited data and knowledge regarding the potential harm that could arise from the [COVID-19] vaccine for someone with [Plaintiff's] medical status." *Id.* ¶ 33. Some studies have acknowledged a "plausible association between unexpected thromboembolic events and COVID-19 vaccines . . . an immune-mediated mechanism, akin to what happens in APS, could be a possibility" and "most vaccinated people who developed severe coagulation disorders were young women, who also represent the target population of APS." *Id.* ¶ 35 (quoting Rossella Talotta and Erle S. Robertson, *Antiphospholipid Antibodies and Risk of Post-COVID-19 Vaccination Thrombophilia: The Straw that Breaks the Camel's Back?*, Nat'l Libr. of Med. (May 28, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8159713/).

On September 21, 2021, Plaintiff submitted a request for an accommodation to be exempted from the COVID-19 vaccine, 2d Am. Compl. ¶ 39, "follow[ing] [Defendants'] procedures for an accommodation request, us[ing] the required forms, and attach[ing] a letter from her hematologist[,]" *id.* ¶ 40; *see also* Pl.'s Request for Med. Exemption from the COVID-19 Vaccine (the "Exemption Request"), ECF No. 49-1. Her physician stated in a letter submitted with the exemption request "there is theoretical evidence of potential increased risk of thrombosis in patients with antiphospholipid syndrome therefore at this time it is our

recommendation that the patient hold off on receiving the [COVID-19] vaccine as it may increase her risk of thrombosis until there is more data." 2d Am. Compl. ¶ 41. Plaintiff's physician also noted, however, her condition is "[n]ot an absolute contraindication to the vaccine," and furthermore "if she is unable to have an exemption, would consider empiric/prophylactic aspirin if the vaccine is administered." Exemption Request at 2–3.[4]

On or about September 27, 2021, prior to Plaintiff receiving any acknowledgement of her accommodation request, "the Hospitals suspended [Plaintiff] without pay, compensation or accrual of benefits, because she was unvaccinated." 2d Am. Compl. ¶ 46. The same day, Plaintiff received a letter, dated September 24, 2021, denying her accommodation request. *Id.* ¶ 47; Letter Denying Med. Exemption at 1, ECF No. 49-2 ("Based on the information that was provided, you have not met the criteria to be exempt from the COVID-19 vaccine and the mRNA vaccine would be suitable.").

Following receipt of this letter, Plaintiff attempted to determine why her request was denied and whether she could seek reconsideration. *Id.* ¶ 48. Plaintiff alleges human resources representatives made the following comments, in sum and substance, in response to her inquiry about the denial:

- A panel of hospital doctors and experts had already reviewed the request thoroughly and it was a final determination;
- The only medical exemptions that would be approved were those based on allergies;
- [Plaintiff's] concerns about blood clots [were] misplaced; and

[4] The U.S. Centers for Disease Control and Prevention defines "contraindication" as a "condition[] that increase[s] the risk for a serious adverse reaction[,]" and "precaution" as "a condition that might increase the risk for a serious adverse reaction, cause diagnostic confusion, or compromise the ability of the vaccine to produce immunity." Centers for Disease Control and Prevention, *Vaccines & Immunizations: Contraindications and Precautions* (July 25, 2024), https://www.cdc.gov/vaccines/hcp/imz-best-practices/contraindications-precautions.html?CDC_AAref_Val=https://www.cdc.gov/vaccines/hcp/acip-recs/general-recs/contraindications.html.

- [Plaintiff] should get the vaccine or [she] will lose [her] job.

*Id.* ¶ 50. Plaintiff was further "told . . . it would be useless to appeal the denial if she was not allergic to a component of the vaccine," *id.* ¶ 52, and her "attempts to discuss the accommodation request were met with disapproval and animus," *id.* ¶ 55.

Moreover, Plaintiff was "never given the opportunity to discuss any possible accommodations with the hospital," *id.* ¶ 61, even though she "believed that there were multiple reasonable accommodations that would allow her to safely continue her employment with the hospital despite being unvaccinated," *id.* ¶ 57. According to Plaintiff, because "the Hospitals granted exemptions for at least [five] individuals[,]" it was "per se reasonable that [Plaintiff] could have been accommodated." *Id.* ¶ 58.

Defendants terminated Plaintiff "for cause" on October 28, 2021. *Id.* ¶ 62; *see also* Letter Terminating Employment at 1, ECF No. 49-3. Thereafter, Plaintiff filed for unemployment benefits, which "the hospital" challenged. 2d Am. Compl. ¶ 65. Plaintiff exhausted her administrative remedies with the U.S. Equal Employment Opportunity Commission and filed the instant suit in accordance with her Notice of Right to Sue Letter. *See id.* ¶¶ 5–7.; *see also id.*, Ex. A, Notice of Right to Sue, ECF No. 37-1.

Plaintiff alleges Defendants unlawfully discriminated against her by: (1) "suspending Plaintiff for 30 days without pay, compensation or benefits because of her disability," *id.* ¶¶ 165, 177, 187; (2) "terminating Plaintiff because of her disability," *id.* ¶¶ 166, 178, 188; (3) retaliating against Plaintiff "by suspending and terminating Plaintiff's employment because she made a disability-based accommodation request, a protected activity," *id.* ¶¶ 170, 182, 191; and (4) retaliating against Plaintiff "by interfering with Plaintiff's legal right to obtain unemployment

benefits, a protected activity, upon Defendants' unlawful termination of her employment," *id.* ¶¶ 171; *see also id.* ¶¶ 184, 192.

On October 4, 2023, the State Mandate was repealed. 45 N.Y. Reg. 22 (Oct. 4, 2023).

## II. PROCEDURAL HISTORY

On June 8, 2022, Plaintiff filed a Complaint against Southampton PEO and Stony Brook Southampton Hospital for alleged violations of the ADA and the NYSHRL. *See generally* Compl., ECF No. 1. On June 29, 2022, Plaintiff filed her first Amended Complaint against Defendants Stony Brook Southampton Hospital, Stony Brook University Hospital, and StaffCo of Brooklyn, LLC d/b/a/ Southampton PEO for alleged violations of the ADA and the NYSHRL. *See generally* First Am. Compl., ECF No. 7.

On September 15, 2022, Plaintiff filed her Second Amended Complaint against Defendants. *See generally* 2d Am. Compl. In her Second Amended Complaint, Plaintiff alleges the following causes of action: (1) Defendants discriminated against Plaintiff in violation of the ADA; (2) Defendants retaliated against Plaintiff in violation of the ADA; (3) State Defendants discriminated against Plaintiff in violation of the Rehab Act; (4) State Defendants retaliated against Plaintiff in violation of the Rehab Act; (5) Defendants discriminated against Plaintiff in violation of the NYSHRL; and (6) Defendants retaliated against Plaintiff in violation of the NYSHRL. *Id.* ¶¶ 160–92 (Counts One through Six). Plaintiff seeks, *inter alia*, declarations that Defendants engaged in unlawful employment practices against her; retroactive damages constituting lost wages and benefits, as well as other compensatory damages to make her whole; punitive damages; attorney's fees and costs; and injunctive relief, including, but not limited to, reinstatement. *Id.* at 26–27.

On December 23, 2022, Defendants each moved to dismiss the Second Amended Complaint. *See generally* State Defs.' Mot. to Dismiss; StaffCo Mot. to Dismiss. The parties filed supplemental briefing on intervening case law in January and February 2024. *See* ECF Nos. 57, 59, 60. On May 1, 2024, the Court held oral argument on the pending motions to dismiss. May 1, 2024 Min. Entry.

## III. STATE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

State Defendants move to dismiss Plaintiff's ADA and NYSHRL claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* State Defs.' Mot. to Dismiss at 7–8. Specifically, State Defendants argue Plaintiff's ADA and NYSHRL claims against Hospital Defendants and Gomes in her official capacity—as agents or instrumentalities of the State of New York—are barred by state sovereign immunity pursuant to the Eleventh Amendment of the U.S. Constitution. *Id.*

While Plaintiff concedes her "claims under the NYSHRL and certain claims under the ADA and Rehab Act" are barred by state sovereign immunity, she maintains her "claims against [Gomes] for injunctive relief pursuant to the ADA, and her claims against [Hospital Defendants] pursuant to the Rehab Act, are fully supported by law, despite sovereign immunity." Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 5–6, ECF No. 53.[5]

---

[5] State Defendants nowhere argue the Rehab Act claims should not apply to them on sovereign immunity grounds. *See* State Defs.' Mot. to Dismiss at 6–8 (arguing Plaintiff improperly brought a Rehab Act Claim against Gomes, but asserting the Eleventh Amendment only bars Plaintiff's ADA and NYSHRL claims as to Hospital Defendants and Gomes in her official capacity); State Defs.' Reply at 1 (noting, after Plaintiff conceded immunity applied to certain claims, the claims still outstanding included "discrimination and retaliation claims under the [Rehab Act] against [Hospital Defendants][.]")

## A. APPLICABLE LAW

### i. Standard of Review

"A case is properly dismissed for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). The party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction exists]." *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).

A motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual" in nature. *See Rahman v. Garland*, 791 F. Supp. 3d 357, 362 (E.D.N.Y. July 14, 2025) (Merchant, J.). A "[f]acial attack challenge[s] the sufficiency of the pleading and, like a motion under Rule 12(b)(6), require[s] the court to accept all factual allegations in the complaint as true." *Id.* (citing *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)); *see also Fox v. Commonw. Worldwide Chauffeured Transp. of N.Y., LLC*, 08-CV-1686, 2009 WL 1813230, at *1 (E.D.N.Y. June 25, 2009) (Garaufis, J.). Meanwhile a "factual" attack "places the jurisdictional facts [ ] in dispute . . . by proffering evidence beyond the pleadings." *Rahman,* 791 F. Supp. 3d at 362 (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016)) (internal quotations and alterations omitted). In such cases the court "has the power and obligation to decide issues of fact by reference to evidence outside the pleadings[.]" *Id.* (citing *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

Neither party directly addresses whether State Defendants make a facial or factual attack on jurisdiction. *See generally* State Defs.' Mot. to Dismiss; Pl. Opp. to State Defs.' Mot. to

Dismiss.[6] However where neither party appears to dispute the specific facts underlying jurisdiction, the Court views the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) to be a facial attack rather than a factual one.

**ii. State Sovereign Immunity and the *Ex parte Young* Exception**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) is "the proper vehicle for arguments that a defendant is protected by sovereign immunity." *Doe v. Haas*, 427 F. Supp. 3d 336, 345 (E.D.N.Y. 2019) (Hurley, J.) (citing *Wake v. United States*, 89 F.3d 53, 57 (2d Cir. 1996)).[7]

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. As a result, "[a] State is . . . immune from suits in federal court brought by its own citizens and such immunity extends to officers acting on behalf of the State." *Unkechaug Indian Nation v. N.Y. State Dept. of Env't. Conservation*, 677 F. Supp. 3d 137, 147 (E.D.N.Y. 2023) (Kuntz, J.) (citing *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 243 (E.D.N.Y. 2015) (Kuntz, J.)); *see also Hans v. Louisiana*, 134 U.S. 1, 10 (1890).

---

[6] In her opposition, Plaintiff cites only precedent applying the standard of review pursuant to Federal Rule of Civil Procedure 12(b)(6), which supports a facial attack on jurisdiction. *See* Pl.'s Opp. to State Defs.' Mot to Dismiss at 5–6 (citing *Mujo v. Jani-King Int'l*, 13 F.4th 204, 208 (2d Cir. 2021)).

[7] The Second Circuit has expressed some skepticism as to whether a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) is the proper avenue for Eleventh Amendment immunity arguments. *See Ripa v. Stony Brook Univ*, 808 Fed. Appx. 50, 50 n.1 (2d. Cir. 2020) ("Whether Eleventh Amendment immunity 'constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense' has not yet been decided by the Supreme Court or this Court." (citing *Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013))). However, because this remains an open question, *id.*, and does not ultimately alter the Court's decision, the Court proceeds under Rule 12(b)(1) as framed by the parties.

There are limited exceptions to the application of sovereign immunity to states and their agencies. "First, a state may waive its Eleventh Amendment defense." *Deadwiley v. N.Y. State Office of Children & Family Servs.*, 97 F. Supp. 3d. 110, 115 (E.D.N.Y. 2015) (Kuntz, J.) (citing *Winokur v. Office of Court Admin.*, 190 F. Supp. 2d 444, 448 (E.D.N.Y. 2002) (Spatt, J.)); *see also Edelman v. Jordan*, 415 U.S. 651, 673 (1974) ("[W]e will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" (alteration in original) (citing *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909))).

"Second, Congress may abrogate the sovereign immunity of the States by acting pursuant to a grant of constitutional authority." *Deadwiley*, 97 F. Supp. 3d. at 115 (citing *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)).

Third, under the *Ex parte Young* doctrine, "the Eleventh Amendment does not bar a suit against a state official when that suit seeks . . . prospective injunctive relief[] from continuing violations of federal law." *Doall v. Suffolk Cnty Family Ct.*, 05-CV-5891, 2008 WL 11412188, at *3 (E.D.N.Y. Nov. 26, 2008) (Spatt, J.) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996)); *see also Ex parte Young*, 209 U.S. 123, 160 (1908) ("The State has no power to impart to [the state official] any immunity from responsibility to the supreme authority of the United States.").

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *City of Shelton v. Hughes*, 578 Fed. App'x. 53, 55 (2d Cir. 2014) (internal citation omitted). For example, courts have found claims for reinstatement and expunging negative

information from personnel files to satisfy *Ex parte Young*'s prospective relief requirement. *See, e.g., Colvin v. State Univ. College at Farmingdale*, 13-CV-3595, 2014 WL 2863224, at *10 (E.D.N.Y. June 19, 2014) (Feuerstein, J.) (reinstatement); *Malkan v. Mutua*, 12-CV-236, 2012 WL 4722688, at *7–8 (W.D.N.Y. Oct. 3, 2012) (Arcara, J.) (expunging negative information)). That said, this exception "only authorizes suit against officials with the authority to provide the requested relief." *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (Bianco, J.) (internal citations omitted).

**B. DISCUSSION**

**i. State Law Claims Against State Defendants**

Plaintiff concedes her NYSHRL claims against State Defendants are barred by the Eleventh Amendment. Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 5–6 ("Plaintiff concedes sovereign immunity acts as a bar for Plaintiffs claims under the NYSHRL[.]").

"[C]ourts in this circuit conclusively hold that [Stony Brook University], as a division of [the State University of New York], is an arm of the State of New York for sovereign immunity purposes." *Gille v. Stony Brook Univ.*, 22-CV-2974, 2025 WL 850420, at *8 (E.D.N.Y. Mar. 18, 2025) (Dunst, M.J.) (collecting cases); *see also Casino v. Stony Brook Univ. Med. Center*, 13-CV-6357, 2014 WL 317368, at *4 (E.D.N.Y. Jan. 27, 2014) (Feuerstein, J.) (finding medical centers operated by Stony Brook University are an integral part of the State of New York). Moreover, a claim for damages against a state employee, such as Gomes, "in [her] official capacity is deemed to be a claim against the state and therefore barred by Eleventh Amendment sovereign immunity." *Keesh v. Quick*, 19-CV-8942, 2021 WL 639530, at *5 (S.D.N.Y. Feb.17, 2021) (Halpern, J.) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)).

The Court agrees Plaintiff's NYSHRL claims against State Defendants (including Gomes in her official capacity) are barred, as the State of New York has never expressly waived its state

sovereign immunity under the NYSHRL, nor has Congress abrogated this immunity. *See e.g. Cater v. New York*, 316 F. Supp. 3d. 660, 667 (S.D.N.Y. 2018) ("It is undisputed that New York has not waived its immunity from suit under the New York Human Rights Law, of which Section 296 of the N.Y. Executive Law is a part."); *Iwelu v. N.Y. State Office of Mental Health*, 22-3096, 2024 WL 2175938, at *2 (2d Cir. May 15, 2024) (no congressional abrogation of immunity to NYSHRL claims) (internal citations omitted).

However, Plaintiff also brought claims against Gomes in her individual capacity, which do not fall under the sovereign immunity umbrella. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) (noting the Eleventh Amendment does not apply to state officials sued in their individual capacities). In light of this, the NYSHRL claims against Gomes in her official capacity are barred by New York's state sovereign immunity, but claims against Gomes in her individual capacity are not.

### ii. Federal Claims against Hospital Defendants

Plaintiff likewise appears to concede state sovereign immunity bars her ADA claims against Hospital Defendants. *See* Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 5, 10–11 (not contesting sovereign immunity bar to ADA claims against Hospital Defendants). However, Plaintiff maintains her Rehab Act claims against Hospital Defendants are *not* barred by state sovereign immunity. Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 14–16; State Defs.' Reply at 1, ECF No. 48 (noting, after sovereign immunity applies, "Plaintiff's only remaining causes of action against State Defendants are: (1) discrimination and retaliation under the [Rehab Act] against SUNY; and (2) an ADA Claim against . . . Gomes[.]").

The Court agrees. The Supreme Court has explicitly permitted private parties to enforce Title I of the ADA against states "in actions for injunctive relief under *Ex parte Young*." *Bd. of*

*Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 n. 9 (2001). However, the *Ex parte Young* exception applies solely to state officials, not states or state agencies. *See Santiago v. N.Y. State Dept. of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991) ("[A] plaintiff seeking prospective relief from the state [pursuant to *Ex parte Young*] must name as defendant a state official rather than the state or a state agency directly[.]"). Therefore, "because Congress has never abrogated New York's sovereign immunity from claims under Titles I and V of the ADA and New York has never waived it, all of [Plaintiff]'s ADA claims are barred by the Eleventh Amendment, and are consequently dismissed." *Quadir v. N.Y. State Dept. of Labor*, 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014) (Oetken, J.).

With respect to Plaintiff's Rehab Act claims, "[t]he [U.S. Court of Appeals for the] Second Circuit held that when Congress enacts a statute pursuant to the Spending Clause of the United States Constitution, such as the [Rehab Act], it may condition a state's acceptance of funds upon a waiver of sovereign immunity." *Forziano v. Indep. Grp. Home Living Program, Inc.*, 13-CV-0370, 2014 WL 1277912, at *7 (E.D.N.Y. Mar. 26, 2014) (Wexler, J.); *see also Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 114 (2d. Cir. 2001) (noting Congress' "clear expression of . . . intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment Immunity" where there is "intentional relinquishment or abandonment of a known right or privilege."). "[P]ost-*Garcia*, a district court must determine whether New York waived its sovereign immunity by accepting federal funds via the [Rehab Act] during the time period in dispute." *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 330 (E.D.N.Y. 2014) (Kuntz, J.).

Here, Plaintiff alleges Hospital Defendants accepted federal funds during the relevant time period, beginning in approximately 2021. *See* 2d Am. Compl. ¶¶ 16, 175. This is well after

it was established acceptance of federal funds constitutes a waiver of state sovereign immunity to Rehab Act claims. *See Marino*, 18 F. Supp. 3d at 331–32 (collecting cases). Because the Court must accept all factual allegations as true at the motion to dismiss phase, the Rehab Act claims against Hospital Defendants are not barred by state sovereign immunity.

### iii. Federal Claims Against Gomes in Her Official Capacity[8]

Plaintiff asserts her ADA claims against Gomes in her official capacity are not barred by state sovereign immunity because they fall within the *Ex parte Young* exception to the Eleventh Amendment. Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 10–14.

As a preliminary matter, Plaintiff seems to abandon her Rehab Act claims against Gomes. *See id.* at 5–6, 14–16 (noting only Plaintiff's Rehab Act claims "must proceed against [Hospital Defendants]"); *accord* note 4 *infra*. State Defendants argue claims against Gomes in her official capacity are barred under both the ADA and the Rehab Act. State Defs.' Mot. to Dismiss, at 6–8.

The *Ex parte Young* exception is not limited solely to ADA claims. "[Rehab Act] suits for prospective injunctive relief may, under the doctrine established by *Ex parte Young* . . . proceed against individual officers in their official capacity." *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Gowins v. Greiner*, 01 CV-6933, 2002 WL 1770772, at *9 (S.D.N.Y. July 31, 2002) (Lynch, J.) (noting, "notwithstanding the Eleventh Amendment, both the [Rehab Act] claim and the ADA claim may proceed under *Ex parte Young* as claims for prospective injunctive relief against the individual . . . officials named in their official capacities."). Therefore, state sovereign immunity does not *categorically* bar Rehab Act claims against Gomes in her official capacity.

---

[8] The motion to dismiss claims against Gomes in her individual capacity are properly evaluated pursuant to Federal Rule of Civil Procedure 12(b)(6). *See infra* Sections IV(A)(ii); IV(B)(i).

Even so, the inquiry remains the same—the only remaining question for Rule 12(b)(1) purposes is whether Plaintiff's ADA and Rehab Act claims against Gomes in her official capacity fall within the *Ex parte Young* exception. The Court concludes they do not.

Plaintiff argues she seeks relief which is prospective in nature and has properly alleged an ongoing violation of federal law, as required to fit the *Ex parte Young* exception. First, Plaintiff states she properly pled "Gomes, in her official capacity as [CEO] of Stony Brook University Hospital, violated federal law when she developed, oversaw, and implemented a discriminatory medical exemption policy that she was ultimately responsible for enforcing in the four facilities she oversaw, including Stony Brook Southampton Hospital." Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 11. Second, Plaintiff asserts "[s]aid policy was the basis of Plaintiff's termination 'For Cause.'" *Id.* at 11 (quoting 2d Am. Compl. ¶¶ 13, 176). Third, Plaintiff argues because Defendants' policy is still in place and Plaintiff's employment record still reflects she was terminated "for cause," "Defendants are engaging in ongoing discrimination in violation of the ADA." *Id.* at 11–12. Finally, Plaintiff asserts the prospective relief she seeks—including reinstatement, removing her "for cause" determination, and providing a positive job reference—qualifies her for application of the *Ex parte Young* doctrine. *Id.* at 13–14.[9]

State Defendants reject these arguments. As an initial matter, they argue "[b]ecause Plaintiff does not have a condition that satisfies the medical exemption in Section 2.61(d)(1) of the Mandate . . . Gomes cannot return [Plaintiff] to her prior position without the hospital violating the Mandate." State Defs.' Reply at 9–10. However, this argument relies on the merits

[9] Plaintiff fails to articulate many of the specific requests related to injunctive relief, such as providing a positive job reference, in her Complaint. *See* 2d Am. Compl. at 26–27, ¶¶ A–H. These requests are only raised in any degree of detail in opposition to State Defendants' Motion to Dismiss. Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 13–14.

of Plaintiff's case, which the Court may not consider in the *Ex Parte Young* analysis. *See Verizon Md., Inc. v. Public Service Com'n of Md.*, 535 U.S. 635, 647 (2002) (". . . [T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim.") (citing *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 281 (1997)). Moreover, State Defendants argue Plaintiff fails to show "[Gomes] is empowered in her role as [CEO] and [COO] . . . to reinstate her as a nurse at Stony Brook Southampton Hospital even if she had a qualifying condition." State Defs.' Reply at 10. State Defendants note there are no allegations Gomes hired or supervised Plaintiff, reviewed requests for medical exemptions, or had any authority to overrule the vaccine committee's conclusions. *Id.*; *see also* State Defs.' Mot. to Dismiss at 14.

Plaintiff is correct the alleged relief may qualify as prospective. No matter how forward-facing the requested relief may be, however, Plaintiff fails to explain why Gomes, specifically, is capable of granting such relief. To apply the *Ex parte Young* exception, Plaintiff must show Gomes "[has] the responsibility or capacity to provide [her] with the prospective relief [s]he seeks." *Soloviev v. Goldstein*, 104 F. Supp. 3d. 232, 245 (E.D.N.Y. 2015) (Kuntz, J.). In Plaintiff's own words, Gomes was the "[CEO] and [COO] at Defendant Stony Brook University Hospital" and "oversaw . . . Defendant Stony Brook Southampton Hospital's response to the COVID-19 pandemic, including . . . developing[] and implementing policies and procedures related to staff vaccination requirements." Pl.'s Opp'n to State Defs.' Mot. to Dismiss at 9. According to Plaintiff, "under Gomes's leadership, the Hospitals instituted a per se discriminatory vaccine mandate for all employees." *Id.*

To be sure, Gomes has an important leadership role at the hospitals. But this fact, alone, is insufficient. Nothing in Plaintiff's papers suggests how Gomes would be able to, for instance, "provide Defendant a positive job reference." *Id.*; *see generally* 2d Am. Compl. As far as the

Court can tell, Plaintiff never worked directly with Gomes. Nor is it clear how Gomes—who is not alleged to have personally evaluated Plaintiff's request for exemption—would be able to rehire her or expunge her records. In fact, communications from the hospital associated with Plaintiff's termination came primarily from Human Resources/Site Director Vivian Lee, not Gomes. *See* Letter Denying Med. Exemption at 1; Letter Terminating Employment at 1. Thus, Plaintiff fails to meet the requirements of the *Ex parte Young* analysis, so any claims against Gomes in her official capacity are barred by state sovereign immunity.

In sum, the claims which remain unbarred by sovereign immunity are: (1) the NYSHRL claims against Defendants StaffCo and Gomes in her individual capacity, 2d Am. Compl. ¶¶ 185–92; (2) Rehab Act claims against Hospital Defendants and Gomes in her individual capacity, *id.* ¶¶ 172–84; and (3) ADA claims against Defendant StaffCo and Gomes in her individual capacity, *id.* ¶¶ 160–71.

## IV. DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Both State Defendants and Defendant StaffCo move to dismiss the Second Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally* State Defs.' Mot. to Dismiss; StaffCo Mot. to Dismiss. Specifically, Defendants argue Plaintiff failed to allege sufficient facts to sustain both discrimination or retaliation claims under the ADA, Rehab Act, and NYSHRL.

### A. APPLICABLE LAW

#### i. Standard of Review

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), each claim must set forth sufficient factual allegations, accepted as true, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks

and citation omitted). At the motion to dismiss phase, the Court draws all reasonable inferences in favor of the plaintiff, the non-movant. *Harris*, 572 F.3d at 71.

However, the Court need not credit "legal conclusions" nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 72 (quoting *Iqbal*, 556 U.S. at 678) (alteration in original). Any legal conclusions "must be supported by factual allegations." *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv., Mgmt., Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679). A complaint which offers merely labels, "a formulaic recitation of the elements[,]" or "naked assertion[s] devoid of further factual enhancement" does not allege sufficient facts to survive a motion to dismiss pursuant to Rule 12(b)(6). *Iqbal,* 556 U.S. at 678 (internal citation and quotations omitted) (second alteration in original). Furthermore, where "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" the complaint has not demonstrated "the pleader is entitled to relief." *Pension Benefit Guar. Corp.*, 712 F.3d at 718 (quoting *Iqbal* 556 U.S. at 679).

**ii. Qualified Immunity**

A state official, sued in their individual capacity, "has no Eleventh Amendment Immunity." *Ying Jing Gan*, 996 F.2d at 529 (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Instead, "[t]he privilege of qualified immunity generally shields government officials from [individual] liability for damages on account of their performance of discretionary official functions[.]" *Id.* at 531 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). While qualified immunity is typically an affirmative defense asserted in an answer, a defendant can properly assert qualified immunity arguments at the 12(b)(6) stage if "the factors supporting the defense appear on the face of the complaint." *Hyman v. Abrams*, 630 Fed. Appx. 40, 42 (2d Cir. 2015) (citing *McKenna v. Wright*, 386 F.3d 432, 435–36 (2d Cir. 2004)).

Qualified immunity protects officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Therefore, when resolving a government officials' qualified immunity claim, "a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a [statutory or] constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (internal citations omitted). Courts have the flexibility to determine which of the two prongs to address first when adjudicating qualified immunity at the motion to dismiss stage. *See id.* at 242 ("[T]he judges of the district courts and the courts of appeals are in the best position to determine the order of decision[-]making that will best facilitate the fair and efficient disposition of each case.").

"Assertion of the privilege should be upheld unless 'the contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ying Jing Gan*, 996 F.2d at 532 (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). Furthermore, "[e]ven if the plaintiff's federal rights were clearly established at the time of the alleged violation, [a state official] may nevertheless enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate those rights." *Ramsey v. Monroe*, 04-CV-9644, 2006 WL 8461748, at *5 (S.D.N.Y. Mar. 24, 2006) (Robinson, J.) (citing *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)). A government official is still "shield[ed] . . . from liability . . . regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact[.]" *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012).

To put it bluntly, qualified immunity applies to "all but the plainly incompetent or those who knowingly violate the law." *Wiggins v. Griffin*, 86 F.4th 987, 994 (2d Cir. 2023) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**iii. ADA, Rehab Act, and NYSHRL Discrimination Claims**

Plaintiff raises two primary avenues for her claims under the ADA and the Rehab Act: (1) discrimination based on an adverse employment action; and (2) discrimination based on a failure to accommodate. *See* 2d Am. Compl. ¶¶ 144–47.

"When brought together, claims under [the ADA and the Rehab Act] may be treated identically." *Hilton v. Wright*, 673 F.3d 120, 128 n.7 (2d Cir. 2012) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *see also De Figueroa v. New York*, 403 F. Supp. 3d 133, 158 (E.D.N.Y. 2019) ("Claims of disability discrimination brought pursuant to Title I of the ADA and [the Rehab Act] are analyzed under the same standards.") (Chen, J.). Title I of the ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. Likewise, Section 504 of the Rehab Act protects otherwise qualified individuals with a disability from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any program or activity receiving Federal financial assistance" "solely by reason of his or her disability." 29 U.S.C § 794.

To sufficiently allege a *prima facie* case of employment discrimination on an "adverse employment action" theory, a plaintiff must establish: "(1) the employer is subject to the [Rehab Act or] the ADA; (2) the plaintiff is disabled within the meaning of the [Rehab Act or] the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential

functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Gentleman v. State Univ. of N.Y. Stony Brook*, 21-1102, 2022 WL 1447381, at *3 (2d Cir. May 9, 2022) (internal quotation marks and citation omitted).

Meanwhile, to establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, a plaintiff must demonstrate "(1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of h[er] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (alterations in original) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (internal quotation marks omitted). The ADA's implementing regulations suggest "it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218 (2d Cir. 2001) (noting the ADA "envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.") (internal quotation marks and citations omitted).

Although related, Plaintiff's two theories of discrimination "are conceptually distinct[]" and therefore will be addressed as such. *Papaliberios v. Mount Sinai Health Sys., Inc.*, 23-CV-8661, 2025 WL 964114, at *2 (E.D.N.Y. Mar. 31, 2025) (Komitee, J.). "The key distinction between the two theories is that an adverse-employment-action claim considers whether the plaintiff could perform her job duties *even without* a reasonable accommodation . . . [while] a

failure-to-accommodate claim asks if the plaintiff could perform her job duties *if she received such an accommodation*." *Id.* at *2 (emphasis in original). Furthermore, a failure to provide a reasonable accommodation, on its own, "does not equate to an adverse employment action." *Berger v. N.Y. City Police Dept.*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018) (Broderick, J.).

As for Plaintiff's state law claims, the NYSHRL prohibits employers from "refus[ing] to hire or employ," "bar[ring] or . . . discharg[ing] from employment," or "discriminat[ing] against [an] individual in compensation or in terms, conditions or privileges of employment" "because of an individual's . . . disability." N.Y. Exec. Law § 296(1)(a). The legal standard for analyzing discrimination under the ADA, [Rehab Act], and NYSHRL are generally the same. *See Doall v. N.Y. State Unified Ct. Sys.*, 23-CV-0364, 2024 WL3302376, at *7 (E.D.N.Y. July 2, 2024) (Seybert, J.) (collecting cases). However, the NYSHRL is often construed "more liberal[ly,]" requiring plaintiffs to show only that "the employer treated him or her less well, at least in part for a discriminatory reason." *See, e.g., Weekes v. JetBlue Airways Corp.*, 21-CV-1965, 2022 WL 4291371, at *7–8 (E.D.N.Y. Sept. 16, 2022) (Brodie, C.J.) (internal citation omitted) (explaining how the 2019 Amendment brought the NYSHRL standard of review closer to that of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*); *Arazi v. Cohen Bros. Realty Corp.*, 20-CV-8837, 2022 WL 912940, at *7 (S.D.N.Y. Mar. 28, 2022) (Woods, J.) (same).

At the motion to dismiss phase, plaintiffs are "not required to plead a prima facie case" of employment discrimination. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). Instead, plaintiff's complaint "need only give plausible support to a minimal reference of discriminatory motivation." *Id.*

### iv. ADA, Rehab Act, and NYSHRL Retaliation Claims[10]

Employers may not "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by [the ADA or Rehab Act].'" *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (citing *Lovejoy-Wilson*, 263 F.3d at 222) (first alteration in original).

To establish a retaliation claim under either the ADA or Rehab Act, an employee must demonstrate: (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between said protected activity and the adverse employment action. *Johnson v. Mount Sinai Hosp. Grp.*, 23-466, 2024 WL 3289475, at *2 (2d Cir. 2024). Causation can be show either through direct evidence of a "retaliatory animus" or "indirectly, by showing the protected activity was followed closely by discriminatory treatment." *Sharikov*, 103 F.4th at 170 (citing *Natofsky*, 921 F.3d at 347). Either way, "[a] plaintiff must show that 'but for' the protected activity, the adverse action would not have been taken.'" *Id.* (internal citations omitted).

A "more liberal pleading standard" applies to Plaintiff's state retaliation claims. *Arazi*, 2022 WL 912940, at *16. To allege retaliation under the NYSHRL, Plaintiff need only plead "that (1) [she] engaged in a protected activity as that term is defined under the NYCHRL, (2) [her] employer was aware that [she] participated in such activity, (3) [her] employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Id.* at *17.

---

[10] The Second Amended Complaint alleges retaliation claims under the ADA and Rehab Act, but cites to the Title VII anti-retaliation provision, 42 U.S.C. § 2000e-3(a). 2d Am. Compl. ¶ 168.

### v. The State Mandate

The State Mandate effective during the period of Plaintiff's accommodation request and termination required covered entities to "continuously require personnel to be fully vaccinated against COVID-19 . . . absent receipt of an exemption as allowed below." 10 N.Y.C.C.R. § 2.61(c) ("Prevention of COVID-19 transmission by covered entities") (Aug. 26, 2021). "Personnel" under the State Mandate included "all persons employed or affiliated with a covered entity, whether paid or unpaid, including but not limited to employees, members of the medical and nursing staff, contract staff, students, and volunteers, who engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease." *Id.* § 2.61(a)(2).

Subdivision (d)(1) of the State Mandate stated as follows regarding medical exemptions:

> If any licensed physician, physician assistant or certified nurse practitioner certifies that immunization with COVID-19 vaccine is detrimental to the health of member of a covered entity's personnel, based upon a pre-existing health condition, the requirements of this section relating to COVID-19 immunization shall be inapplicable only until such immunization is found no longer to be detrimental to such personnel member's health. The nature and duration of the medical exemption must be stated in the personnel employment medical record, or other appropriate record, and must be in accordance with generally accepted medical standards, (see, for example, the recommendations of the Advisory Committee on Immunization Practices of the U.S. Department of Health and Human Services) ["ACIP"], and any reasonable accommodation may be granted and must likewise be documented in such record.

In September 2021, the New York State Department of Health published guidance regarding the State Mandate (the "NYDOH Guidance"). *See* N.Y. Dept. of Health, *Frequently Asked Questions Regarding August 26, 2021 – Prevention of COVID-19 Transmission by Covered Entities Emergency Regulation* (Sept. 20, 2021). The NYDOH Guidance specifically noted any medical exemptions "must be in accordance with generally accepted medical

standards" and states the ACIP "publishes generally accepted medical standards for COVID-19 vaccination medical exemptions." *See id.* ("Q: What are the applicable ACIP COVID-19 vaccination contraindications and precautions at the time of the publication of this guidance?").

### B. DISCUSSION

#### i. Qualified Immunity Bars Claims against Gomes in her Individual Capacity

As a preliminary matter, Plaintiff's claims against Gomes in her individual capacity are barred by qualified immunity. Defendants' implementation of the State Mandate, for reasons enumerated in the rest of this section, did not violate constitutional or statutory law. [11] However, even if they did, the Court does not find any support for the contention Gomes "knowingly" violated the law or acted in a manner that was "plainly incompetent[.]" *Wiggins*, 86 F.4th at 994; *see also Sudler*, 689 F.3d at 174 (noting a state official can make a reasonable mistake the law or fact and still be afforded qualified immunity).

"Regarding COVID-19 mitigation measures, courts across the country have repeatedly held government officials to be immune from suit in their personal capacities." *Bellatoni v. Lamont*, 671 F. Supp. 3d 140, 146 (D. Conn. 2023) (Underhill, J.) (collecting cases); *see also Bastian v. Lamont*, 21-CV-1249, 2022 WL 2477863, at *7 (D. Conn. July 6, 2022) (Hall, J.) (finding state officials "were acting within their duty, as state officials" when implementing COVID-19 public health measures and should be afforded qualified immunity). "[T]he very purpose of qualified immunity is to protect officials when their jobs require them to make difficult on-the-job decisions . . . such as in the context of a public health emergency." *See*

---

[11] In her opposition, Plaintiff clarifies she is not alleging a constitutional violation, but rather a violation of a "clearly established statutory right." Pl.'s Opp. to State Def.'s Mot. to Dismiss at 14 ("Nowhere in the complaint does Plaintiff allege a constitutional violation[.]")

*DiBlasio v. Novello*, 413 Fed Appx. 352, 356 (2d Cir. 2011) (internal citation and quotation omitted).

Here, Gomes did exactly that. The State Mandate explicitly provided for exemptions "in accordance with generally accepted medical standards," citing the recommendations of the ACIP, which are limited to allergic responses to the vaccine or vaccine components. *See* 10 N.Y.C.R.R. § 2.61(d)(1); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 289 n. 28 (2d Cir. 2021) ("Under the generally accepted medical standards published by ACIP, cognizable contraindications to the COVID-19 vaccines are limited to [s]evere allergic reaction (e.g., anaphylaxis) after a previous dose or to a component of the COVID-19 vaccine and [i]mmediate (within 4 hours) allergic reaction of any severity to a previous dose or known (diagnosed) allergy to a component of the COVID-19 vaccine." (alterations in original) (internal quotation marks omitted)). Defendants' vaccine policy substantially tracked the ACIP's guidance. *See* Exemption Request at 1.

It strains credulity for the Court to find Gomes "knowingly" violated the law or was "plainly incompetent" when Defendants' policy paralleled the scientific guidance explicitly cited in the law itself. The Court finds no evidence to indicate it was not "objectively reasonable" for the Hospital vaccine exemption policy to track the State Mandate and include only the exceptions put forth by the ACIP. *Ramsey*, 2006 WL 8461748, at *5. Nor can the Court say the State Mandate itself was plainly contrary to constitutional or statutory law so as to make Gomes' adherence to the State Mandate a knowing violation of federal law or an otherwise plainly incompetent act.

Drawing all inferences in Plaintiff's favor, the remaining claims against Gomes in her individual capacity fail on qualified immunity grounds.

### ii. Plaintiff Fails to Allege Sufficient Facts to Support Discrimination Claims Against Defendants Pursuant to a Theory of Adverse Employment Action

Plaintiff's claim for discrimination based on an adverse employment action fails on at least two fronts.[12]

First, by failing to receive her COVID-19 vaccine, Plaintiff was no longer qualified for her position, with or without an accommodation.[13] The Second Circuit has established vaccination "[is] a condition of employment in the healthcare arena." *We the Patriots USA, Inc.*, 17 F.4th at 287, 294; *see also Bandalos v. Stony Brook Univ. Med. Ctr.*, 23-CV-135, 2024 WL 4276175, at *5 (E.D.N.Y. Sept. 24, 2024) ("While [p]laintiff was undisputably qualified before [the State Mandate] due to her thirty-seven years of experience . . . [the State Mandate] ultimately changed [her] job requirements to include that she must be vaccinated with one of the COVID-19 vaccines unless she received an authorized exemption.") (Wicks, M.J.) (internal quotation marks omitted); *Abramov v. Northwell Health Sys.*, 22-CV-6687, 2024 WL 4276171, at *10 (E.D.N.Y. Sept. 24, 2024) (Merchant, J.) ("[COVID-19] vaccination was a qualification of employment and [plaintiff's] choice not to get vaccinated (without a medical exemption) makes her *per se* unqualified for her position." (emphasis in original)); *Papaliberios*, 2025 WL 964114, at *4 (noting "[the plaintiff] refused [COVID-19] vaccination—an essential qualification for

---

[12] StaffCo argues Plaintiff failed to allege sufficient facts to establish a disability in her Complaint. Under the ADA, a disability is defined as "an impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Courts regularly dismiss complaints that do not specify the nature, duration, or frequency of a disabling condition[.]" *Papaliberos*, 2025 WL 964114, at *3. Plaintiff details a serious medical event she experienced in 2006 which resulted in her diagnosis. 2d Am. Compl. ¶¶ 71–77. Since then, "when ill, [Plainiff] becomes sicker than most," *id.* ¶ 78, and her condition "requires vigilance over anything that implicates blood flow . . . and the monitoring of clotting factors in her blood[,]" *id.* ¶ 87. These claims provide minimal detail on the actual duration or frequency of her condition. However, reading the facts in a light most favorable to Plaintiff at the motion to dismiss phase, the Court assumes for the sake of argument her condition qualifies as a disability in its analysis.

[13] For the Court's discussion as to whether Plaintiff was due an accommodation, *see infra* Section IV(B)(iii).

patient care in New York at the time of her firing," making her "unqualified for her position once the vaccine mandate came into effect.").

To qualify for her role, Plaintiff needed to either receive a medical exemption or achieve the proper vaccination status. She did neither. Plaintiff chose not to receive a COVID-19 vaccine, *see* 2d Am. Compl. ¶ 32, and she was denied a medical exemption because, as her own doctor noted, her condition was "not an absolute contraindication to the vaccine" and did not meet one of the enumerated exceptions in Defendants' policy, Exemption Request at 2.

Second, Plaintiff's causal link fails. Plaintiff was not terminated from her role because of her disability; she was terminated because she failed to abide by Defendants' vaccine policy. The policy applied to all employees, regardless of whether they engaged in protected activity. *See Goe v. Zucker*, 43 F.4th 19, 35 (2d Cir. 2022) (rejecting Rehab Act claims where "the new [vaccine] regulations appl[ied] to all students, and not just students with disabilities"). A registered nurse in Plaintiff's exact role with no disability who chose to forego the COVID-19 vaccine would have been terminated by Defendants, just as Plaintiff was. As the Second Circuit held in *Goe*, Plaintiff's denial of a medical exemption was due to a failure of compliance with new procedures, not "solely by reason of" her disability.[14] *Id.* at 37.

Plaintiff attempts to save her claims by wholly invalidating Defendants' vaccine policy, arguing the "policy and practice of undertaking 'limited' consideration of [Plaintiff's] reasonable accommodation disability request is per se illegal and discriminatory" because Defendants were

---

[14] Plaintiff's effort to distinguish *Goe* is unpersuasive. While *Goe* involved a vaccine mandate in schools rather than in the medical field, it was not merely a "class action . . . brought by parents and their children , , , to challenge [a] vaccine mandate" as Plaintiff claims. Pl.'s Opp'n to StaffCo Defs. Mot. to Dismiss at 25. The Second Circuit considered whether mandatory immunization requirements in schools—which required physicians to evaluate contraindications consistent with national guidance—violated the Rehab Act. *Goe*, 43 F.4th at 35–36. The relevant regulations closely resembled the State Mandate and Defendants' vaccine policies, including the use of ACIP guidelines for contraindications. *See id* at 25–27.

"not empower[ed] . . . to issue blanket limitations, *a priori or posteriori*, to employee accommodation requests." 2d Am. Compl ¶ 129. However, Defendants' policy did not apply solely issue "blanket" limitations. As discussed in Section IV(B)(i), *supra*, Defendants' policy closely paralleled ACIP guidance, the source of "generally accepted medical standards" explicitly provided for in the State Mandate. Plaintiff "does not challenge" the validity of the State Mandate, which included by reference the very exceptions she now labels as discriminatory. Pl.'s Opp'n to StaffCo Mot. to Dismiss at 6, ECF No. 54.

In sum, even under the more liberal state law standard, Plaintiff fails to establish an adverse employment action was taken against her because she was neither qualified for her position following the implementation of the State Mandate, nor terminated because of her disability.

### iii. Plaintiff Fails to Allege Sufficient Facts to Support Discrimination Claims Against Defendants under a Failure-to-Accommodate Theory

To establish a failure-to-accommodate claim, the plaintiff bears the burden of "identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." *Jeter v. Mount Sinai Health Sys.*, 23-CV-7889, 2026 WL 818735, at *7 (S.D.N.Y. Mar. 25, 2026) (Broderick, J.) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)). However, a plaintiff must also show, with any such accommodation, she would be capable of performing the essential functions of her job. *Natofsky,* 921 F.3d at 352. A requested accommodation also fails if an employer can show it would "cause [them] to suffer an undue hardship." *See Jeter*, 2026 WL 818735, at *7.

Here, Plaintiff's proposed accommodations would either put Defendants squarely in violation of the State Mandate or remove Plaintiff from the essential functions of her role. Plaintiff argues she could have undertaken "a combination of testing, monitoring and increased

[use of Personal Protective Equipment (PPE)][.]" 2d. Am. Compl. ¶ 116. But additional PPE and monitoring "would have placed Defendant[s] in violation of [New York State law] for employing unvaccinated personnel," as Plaintiff would remain in a patient-facing position, unvaccinated, without a medical exemption. *See Jeter*, 2026 WL 818735, at *7 (internal quotation omitted) (second alteration in original). As the Second Circuit clarified in *We the Patriots USA v. Hochul*, it would be "erroneous[] [to] conclude . . . employers may grant religious accommodations that allow employees to continue working, unvaccinated, at positions in which they 'engage in activities such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease.'" 17 F.4th 368, 370 (2d. Cir. 2021) (quoting 10 N.Y.C.R.R. § 2.61). The Court sees no reason why the same principle should not apply in the disability context.

Alternatively, Plaintiff suggests Defendant could have transferred Plaintiff "temporarily to a remote or light duty job that minimized her exposure to others . . . outside of patient care" such as "record keeping[,] audits[,]" telemedicine, or granting her a leave of absence. 2d Am. Compl. ¶¶ 123–27. Rather than providing an exemption to the vaccine requirement for Plaintiff, this would "remove [Plaintiff] from the scope of the rule" entirely. *See We the Patriots USA, Inc.*, 17 F.4th at 370. However, as a registered nurse in an in-person, patient-facing role, any accommodation which placed her "outside of patient care" would also effectively remove Plaintiff from the typical, and essential, day-to-day functions of her job. The proposed accommodations may limit her exposure to patients, but Plaintiff bears the burden of sufficiently pleading she would remain able to perform the essential functions of her job via telemedicine, record keeping, or audits. Plaintiff provides no such allegations. *See generally* 2d Am. Compl.

Plaintiff further argues "[Defendants] discriminated against [Plaintiff] on the basis of her disability as it failed to meet its legal obligation to engage in a flexible, individualized, and interactive process with her to identify and meaningfully consider workplace accommodation options[.]" *Id.* ¶ 130. This vastly overstates the law. While the ADA envisions the use of an "interactive process" for accommodation requests, "[t]he Second Circuit has expressly held that [ ] 'failure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible." *Seivright v. Montefiore Med. Ctr., Hosp. of Albert Einstein College of Med.*, 11-CV-8934, 2014 WL 896744, at *6 (S.D.N.Y. Mar. 3, 2014) (Nathan, J.) (citing *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 100 (2d Cir. 2009)); *see also Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017) ("[T]o determine the appropriate reasonable accommodation it <u>may</u> be necessary for the [employer] to initiate an informal, interactive process[.]" (emphasis in original) (citing 29 C.F.R. § 1630.2(o)(3))). Where Plaintiff was neither qualified nor demonstrated an "accommodation was possible," Defendants had no "legal obligation" to engage with Plaintiff in an interactive accommodation process. *Seivright*, 2014 WL 896744, at *6.

The same is true of Plaintiff's NYSHRL claims. While the failure to engage in an interactive process is an "important consideration when evaluating a failure-to-accommodate claim[,]" the New York Court of Appeals has found "an employer's failure to engage in an interactive process is not a *per se* violation" of the NYSHRL. *See LeBlanc v. United Parcel Serv.*, 11-CV-6983, 2014 WL 1407706, at *18 n. 14 (S.D.N.Y. Apr. 11, 2014) (Failla, J.) (citing *Jacobsen v. New York City Health and Hosps. Corp.*, 22 N.Y.3d 824, 837–38 (2014)) ("[T]o the extent the Appellate Division's decision . . . can be interpreted as implying that a good faith

interactive process is an independent element of the disability discrimination analysis under [the NYSHRL or NYCHRL] . . . we reject that notion.").

The cases Plaintiff offers in supplemental briefing do little to bolster her arguments. *See* Pl.'s Supp. Briefing, ECF No. 57. Most glaringly, neither *Grullon v. City of New York*, 2023 N.Y. Misc. LEXIS 510 (Sup. Ct. Feb. 3, 2023) (Edwards, J.), nor *Mehr v. Mount Sinai Hospital*, 2023 N.Y. Misc. LEXIS 23012 (Sup. Ct. Dec. 12, 2023) (Williams, J.), involved an individual working in the medical profession. Grullon was a police officer, while Mehr was director of strategic partnerships in a school office of diversity and inclusion. *See Grullon*, 2023 N.Y. Misc. LEXIS 510, at *1; *Mehr*, 2023 N.Y. Misc. LEXIS 23012, at *3. Neither role would implicate the Second Circuit's prevailing view that a vaccine is a condition of employment for healthcare workers. *See We the Patriots USA, Inc.*, 17 F.4th at 287. Furthermore, *Grullon* centered on a wholly separate standard, evaluating the substantive merits of an accommodation request pursuant to Article 78. *See Grullon*, N.Y. Misc. LEXIS 510, at *15–*17.[15] Meanwhile *Mehr* articulated the same framework of analysis articulated here, stating plaintiff bore the burden of demonstrating any proposed accommodation was reasonable and would continue to enable her to perform her job. *See generally Mehr*, 2023 N.Y. Misc. LEXIS 23012. Neither alters the framework of analysis discussed herein.

#### iv. Plaintiff Fails to Allege Sufficient Facts to Support a Retaliation Claim Against Defendants

Finally, Plaintiff argues she was retaliated against because, "after denying [her] a reasonable accommodation of any sort, [Defendant StaffCo] terminated her 'for cause,'" and

[15] While the court in *Grullon* discussed the need for an interactive process pursuant the NYSHRL, *see id.* at *9 (citing *Hosking v Mem'l Sloan-Kettering Cancer Ctr.*, 186 A.D.3d 58, 63 (1st Dept. 2020)), the New York Court of Appeals previously rejected the idea that such a process is an explicit requirement to sustain a NYSHRL claim in *Jacobsen*. 22 N.Y.3d at 838.

"challenged her [unemployment benefits]." Pl.'s Opp'n to StaffCo Mot. to Dismiss at 13. However, even under a more liberal state law standard, she fails to adequately plead a causal connection between her request for a medical exemption and the alleged retaliation.

As the Second Circuit noted in *Johnson*, where a vaccine policy "applied to all employees regardless of whether they had engaged in protected activity, [a plaintiff] has not plausibly pleaded a connection between he[r] invocation[] of the ADA and h[er] termination[.]" 2024 WL 3289475, at *2 (internal quotation marks omitted) (second and third alterations in original). Put simply, whether or not Plaintiff sought a medical exemption, her failure to receive the COVID-19 vaccine would have resulted in the allegedly "retaliatory" conduct. Plaintiff has failed to sufficiently plead the "protected activity" of seeking a medical exemption was the animus for Defendant terminating her employment or challenging her employment benefits.

Plaintiff states the "close temporal relationship between [P]laintiff's participation in a protected activity and an employer's adverse action is alone sufficient to establish causation." Pl.'s Opp'n to StaffCo Mot. to Dismiss at 28. Close temporal proximity *may* demonstrate retaliation, in certain factual circumstances. *See Trower v Mount Sinai Hosp.*, 16-CV-4322, 2018 WL 4283724, at *12 (S.D.N.Y. Sept. 6, 2018) (Castel, J.) (noting while temporal proximity "may" support an inference of retaliatory purpose, "temporal proximity alone is not enough to establish retaliatory purpose[.]"). But the timeline in this action cuts against Plaintiff's argument.

By Plaintiff's own admission, when Defendants instituted their mandatory vaccine policy, they also "instituted a *blanket* . . . policy that [they] would 'vigorously challenge' any terminated employee's filing for unemployment benefits." 2d Am. Compl. ¶ 64 (emphasis added). Defendants' vaccine policy went into place on or about September 10, 2021, and Plaintiff did not

submit her request for a medical exemption until September 21, 2021. *See id.* ¶¶ 31, 39. The policy thus *predated* Plaintiff's request for a medical exemption. Plaintiff cannot sustain a retaliation claim where the alleged retaliatory conduct was established before her protected activity ever took place. *See, e.g., Sharikov*, 103 F.4th at 170 (rejecting retaliation claim where mandatory vaccine policy "was sent to all employees before [the plaintiff] engaged in any protected activity."). Plaintiff also acknowledges this was a "blanket" policy, applying to all employees equally, not just those who sought a medical exemption. *See* 2d Am. Compl. ¶ 64

Therefore, Plaintiff fails to allege sufficient facts to sustain a causal connection between her "protected activity" and any retaliatory conduct, and so fails to sustain her retaliation claims under state or federal law.

## V. CONCLUSION

Based on the foregoing analysis, Defendants' Motions to Dismiss are GRANTED. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 47 and 51 and close the case.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 20, 2026
Brooklyn, New York